UNITED STATES of America

v.

**Bill R. HUNTER, d/b/a The Courier.**

Civ. No. 70–816–T.

United States District Court,
D. Maryland.

April 13, 1971.

Frank E. Schwelb and Robert J. Wiggers, Attys., Dept. of Justice, Washington, D. C., and George Beall, U. S. Atty., Baltimore, Md., for plaintiff.

Arthur B. Hanson and W. Frank Stickle, Jr., Rockville, Md., and Ralph N. Albright, Jr., Washington, D. C., for defendant.

THOMSEN, District Judge.

This is the first action brought by the Government against the publisher of a newspaper under the "Fair Housing" provisions of the Civil Rights Act of 1968, 42 U.S.C.A. § 3601 et seq., to enjoin an alleged violation of subsection (c) of § 3604, which provides:

"§ 3604.  *Discrimination in the sale or rental of housing*

"As made applicable by section 3603 of this title and except as exempted by sections 3603(b) and 3607 of this title, it shall be unlawful—

" * * *

"(c) To make, print, or publish, or cause to be made, printed, or published any notice, statement, or advertisement, with respect to the sale or rental of a dwelling that indicates any preference, limitation, or discrimination based on race, color, religion, or national origin, or an intention to make any such preference, limitation, or discrimination.

" * * * * "

The only exemption referred to by the parties, the so-called "Mrs. Murphy" exemption, contained in § 3603(b) (2), provides:

"(b) Nothing in section 3604 of this title (other than subsection (c)) shall apply to—

" * * *

"(2) rooms or units in dwellings containing living quarters occupied or intended to be occupied by no more than four families living independently of each other, if the owner actually maintains and occupies one of such living quarters as his residence."

■ Under § 3613 the Attorney General may bring a civil action for an injunction and other appropriate relief whenever he has reasonable cause to believe either "that any person or group of persons is engaged in a pattern or practice of resistance to the full enjoyment of any of the rights granted by this subchapter", or "that any group of persons has been denied any of the rights granted by this subchapter and such denial raises an issue of general public importance".  The Attorney General is proceeding in this case under both alternatives.  A court should not review the Attorney General's finding of reasonable cause, but before granting relief should determine that such a pattern or practice of resistance exists or that there

has been such a denial of rights as would justify the granting of the relief prayed. United States v. Mitchell, 313 F.Supp. 299, 300 (N.D.Ga.1970); United States v. Building & Construction Trades Council, 271 F.Supp. 447, 453 (E.D.Mo.1966).

The Government's case is based upon two advertisements which appeared in defendant's newspaper, correspondence before suit, and an editorial published after this suit was filed. There is little or no dispute about the facts.

Defendant contends: that § 3604(c) does not apply to newspapers disseminating real estate advertisements; that such application would violate the First Amendment, and, in view of the "Mrs. Murphy" exemption, the Fifth Amendment; that the ads involved do not "indicate a preference in violation of § 3604(c)"; and that no pattern, practice, or denial of rights sufficient to justify the relief requested has been shown.

*Findings of Fact*

Defendant, Bill R. Hunter, a resident of Maryland, is publisher and editor of a weekly newspaper, The Courier, published in Prince George's County, Maryland, with a circulation of some 29,000 copies per week, mostly in that county. The Courier carries classified advertisements for the sale or rental of real estate. The advertisers supply the wording of the ads and pay the newspaper for their printing and publication. It is the policy of defendant to refuse to accept an ad if, in his judgment, it is either offensive or deceptive, or the advertiser is not acting in good faith and in good taste.

On January 8, 1970, The Courier carried the following advertisement:

"FOR RENT—Furnished basement apartment. In private white home. Call JO 3–5493."

On January 26, 1970, Frank E. Schwelb, Chief, Housing Section, Civil Rights Division, Department of Justice, sent a letter to defendant, expressing the view that such ads violate the Fair Housing Act of 1968 because they indicate a racial preference, and suggesting that defendant instruct his employees to cease accepting such ads.

Defendant returned the letter with a note on the last page, stating:

"The advertisement to which you refer does not specify that the apartment will be rented only to white occupants. It is the policy of this newspaper to accept no advertising which in any way is racially offensive, however, the statement that the home in which the apartment is located is occupied by white people should not in our opinion be offensive to anyone. We have given no further instructions to our employees.

/s/ Bill R. Hunter
Publisher and Editor"

On February 7, 1970, the Chief of the Housing Section again wrote defendant, setting forth in greater detail why the Civil Rights Division considers that such ads violate the statute.

On March 19, 1970, he sent defendant another letter, stating: "Since you have been unwilling to provide any assurance that you will discontinue the acceptance of advertisements which we believe to be in violation of the law, we shall have no alternative, should further advertisements of this kind appear, to recommend that suit be instituted in the appropriate Court to assure compliance with the Fair Housing Act."

Defendant received the second and third letters, but did not reply. He did, however, instruct his staff to refer any such ads to him before they were published. Due to the failure of an employee to follow that instruction, the following ad was published in The Courier on June 18, 1970, without defendant's having seen it:

"FURNISHED APARTMENT, well located, clean, quiet. In white home. Gentlemen only. $17.50 a week. Call JO 3–5493."

Both ads were placed by an elderly, retired man named Crawford, who lived in southeast Washington.

This suit was filed on July 14, 1970. In its next issue The Courier carried a news article stating: "When questioned about his motive in indicating a white home in his ads, Crawford said, 'it's really a kindness to colored people. There's no use making them spend money to call here or come here when I'm not going to rent to them. I don't legally have to rent to anyone I don't want to'."

The same issue carried a long and not intemperate editorial, entitled "A Free Press", stating, inter alia: "We remain steadfast in our belief in the freedom of the press and the right of every homeowner to decide who shall or shall not live in the house with him."

The editorial also said: "The Courier has never, and will never, publish an advertisement or news item for the purpose of being racist, or in any way race baiting." That has in fact been the policy of the paper, which has published one or more editorials criticizing the actions of white racists.

The editorial also noted that "metropolitan daily newspapers have been publishing the same type ads for some time that the Justice Department is suing The Courier to discontinue." That is true. On the day after this suit was filed the Washington Post carried a story of the filing, and in the same edition carried six ads similar to those which appeared in The Courier, including the following:

"CONN. AVE.—Wht. pvt. home. Apt. for employed, quiet lady, nonsmoker. Nr. bus. 362–2275."

"NE.—Nice rm., colored home. Refined, settled lady pref. 544–7724 aft. 6 p. m."

"NE.—Lovely room in quiet colored home. Settled lady. 832–9063, aft. 6."

Four such advertisements were carried in the Washington Star and three or four in the Washington Daily News on that date. Thereafter, similar ads have been carried by the Washington daily papers, some since this case was heard. Counsel for the Government told the Court that another Department has been negotiating with these large newspapers; but no action has been taken against them.

### Discussion

### I

On its face, § 3604(c) applies to *anyone* who makes, prints or publishes, or causes to be made, printed or published any notice, statement or advertisement with respect to the rental of a dwelling [1] indicating any of the preferences, limitations or discriminations listed in that section. There is no exemption for newspapers, although an exemption is provided for religious organizations and private clubs in other sections of the Act.

In Brush v. San Francisco Newspaper Printing Co., 315 F.Supp. 577 (N.D.Cal. 1970), appeal pending, relied on by defendant, the Court was dealing with § 704(b) of the Civil Rights Act of 1964, 42 U.S.C.A. 2000e–3(b), which specifically states: "It shall be an unlawful employment practice for an employer, labor organization, or employment agency to print or publish" discriminatory advertisements relating to their own employment functions. Moreover, in *Brush,* the legislative history showed that the House Judiciary Committee Report stated: "The prohibitions of this section do not require newspapers and other publications to exercise any control or supervision over, or to do any screening of the advertisements or notices published by them". See 315 F.Supp. at 582.

The legislative history of the 1968 Act, involved in this case, contains no suggestion that newspapers are to be exempted. The only reference to newspapers was a statement by Senator Ellender, an opponent of the bill, who said in the course of debate:

"* * * Apparently, under this provision any newspaper publisher who accepted an advertisement indicating

---

1. Including a room or apartment in a dwelling, § 3602(b).

a preference by the owner of a certain race or religion would be in violation of the law. Apparently, freedom of speech and press guaranteed in the Bill of Rights is to be abolished with the inauguration of this open housing amendment." Cong.Rec., Sen., p. 3134, Feb. 15, 1968.

The Supreme Court said in Arizona v. California, 373 U.S. 546, 583, n. 85, 83 S.Ct. 1468, 1489, 10 L.Ed.2d 542 (1963): "We recognize, of course, that statements of opponents of a bill may not be authoritative, see Schwegmann Bros. v. Calvert Distillers Corp., 341 U.S. 384, 394–395, 71 S.Ct. 745, 750–751, 95 L.Ed. 1035 (1951), but they are nevertheless relevant and useful, especially where, as here, the proponents of the bill made no response to the opponents' criticisms."

This Court concludes that § 3604(c) applies to newspapers.[2]

## II

■ The restrictions in § 3604(d) limit speech only in a commercial context, not in relation to the dissemination of ideas. The Supreme Court and other courts have ruled that commercial activities are not entitled to the same First Amendment protections that are afforded to the expression of racial, religious or political views. See e. g., Breard v. Alexandria, 341 U.S. 622, 71 S.Ct. 920, 95 L.Ed. 1233 (1951); Valentine v. Chrestensen, 316 U.S. 52, 62 S.Ct. 920, 86 L.Ed. 1262 (1942); Jamison v. Texas, 318 U.S. 413, 63 S.Ct. 669, 87 L.Ed. 869 (1943); New York State Broadcasters Ass'n, Inc. v. United States, 414 F.2d 990 (2 Cir. 1969), cert. denied 396 U.S. 1061, 90 S.Ct. 752, 24 L.Ed.2d 755 (1970); Halsted v. Securities & Exchange Commission, 86 U.S.App.D.C. 352, 182 F.2d 660, 668–669 (1950). See

also Note, Freedom of Expression in a Commercial Context, 78 Harv.L.Rev. 1191 (1965).

In United States v. Bob Lawrence Realty, Inc., 313 F.Supp. 870, 872 (N.D. Ga.1970), dealing with another subsection of § 3604, Judge Edenfield said:

"* * * It is evident that the statute does not make mere speech unlawful. What it does make unlawful is economic exploitation of racial bias and panic selling. We conclude that the statute is one regulating conduct, and that any inhibiting effect it may have upon speech is justified by the Government's interest in protecting its citizens from discriminatory housing practices and is not violative of the First Amendment." Id. at 872.

See also Brown v. State Realty Co., 304 F.Supp. 1236 (N.D.Ga.1969).

The Supreme Court has held that no prior restraints may be laid upon freedom of the press. Near v. Minnesota, 283 U.S. 697, 551 S.Ct. 625, 75 L.Ed. 1357 (1931). In that case the state argued that the statute forbidding scandalous and defamatory newspapers was directed at the business of publishing such periodicals. In holding the statute unconstitutional under the First Amendment, the Supreme Court said:

"* * * In determining the extent of the constitutional protection [of a free press], it has been generally, if not universally, considered that it is the chief purpose of the guaranty to prevent previous restraints upon publication. * * *" 283 U.S. at 713, 51 S.Ct. at 630.

In the present case, however, what is sought is injunctive relief against discriminatory advertising, not against publication of the newspaper or its editorial policy.

---

**2.** The Court has reached the foregoing determination without giving any substantial weight to a letter dated April 16, 1970, from Robert A. Sauer, Assistant General Counsel for Community Programs, United States Department of Housing and Urban Development, to Margaret Smith of the National News-

paper Association, offered by the Government. See Zuber v. Allen, 396 U.S. 168, 192–194, 90 S.Ct. 314, 24 L.Ed.2d 345 (1969); Udall v. Tallman, 380 U.S. 1, 16, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965); Forbes v. Maddox, 339 F.2d 387 (9 Cir. 1964).

■ Grosjean v. American Press Co., 297 U.S. 233, 56 S.Ct. 444, 80 L.Ed. 660 (1936), also relied on by defendant, involved a tax solely on the advertising revenue of certain newspapers in Louisiana. The court struck down the tax because it was seen to be "a deliberate and calculated device in the guise of a tax to limit the circulation of information to which the public is entitled in virtue of the constitutional guaranties." 297 U.S. at 250, 56 S.Ct. at 449. On the other hand, § 3604(c), as applied to newspapers, is an appropriate means to help eliminate housing discrimination.[3]

■ In a case where the facts justify it, an injunction against carrying the type of advertisements prohibited by § 3604(c) does not constitute an unconstitutional previous restraint on freedom of the press.

### III

Defendant contends "that because Congress granted to homeowners a 'Mrs. Murphy' exemption, under the Fifth Amendment it cannot deny to those homeowners a right to communicate their intention, nor can Congress, under the First and Fifth Amendments, subject newspapers to liability for publishing a real estate advertisement from an exempted homeowner."

The Fair Housing Act of 1968 does not attempt to prohibit an individual homeowner who comes within the provisions of § 3603(b) (2), such as the advertiser in this case, from refusing to rent a room or an apartment in his home to a person who is distasteful to him for any reason. It is not necessary, therefore, to discuss the constitutional right of such an individual to refuse to rent a room or an apartment in his home to any applicant. See discussion in 82 Harv.L. Rev. 1294, at 1312 et seq. See also United States v. Mintzes, 304 F.Supp. 1305, at 1312–1313 (D.Md.1969).

The Act does, however, prohibit both the homeowner and anyone else from making, printing or publishing or causing to be made, printed or published any notice, statement or advertisement with respect to the rental of a room or apartment, even in a private home, which "indicates any preference, limitation, or discrimination based on race, color, religion, or national origin, or an intention to make any such preference, limitation, or discrimination." See § 3603 (b) (2) and § 3604(c), quoted above.

The Government has not joined the advertiser as a party in this case, but in connection with the point raised by the publisher herein, it is necessary to consider whether the advertiser would have a constitutional right to cause to be made, printed or published any notice, statement or advertisement which indicated a prohibited preference or intention.

■ The fact that the statute does not attempt to prohibit a homeowner such as the advertiser in this case from refusing to rent a room or an apartment in his own home to any person for any reason, does not require the conclusion that Congress may not constitutionally prohibit such a homeowner from publishing or causing to be printed or published any notice, statement or advertisement which indicates a preference or intention to discriminate. Whether the homeowner should be denied the right to intimate his preference or limitation in an advertisement is a matter for the Congress, not the Courts.

### IV

The two ads indicate a preference for a white tenant, and were intended to do so.

### V

■ The meaning of the term "pattern or practice" was discussed at length

---

3. It is not "an artificial licensing device" with oppressive and disproportionate requirements unrelated to the defendant's business, by which his publication "can be curtailed or terminated". See United Interchange, Inc. v. Harding, 154 Me. 128, 145 A.2d 94, 99 (1958).

in United States v. Mintzes, supra, 304 F.Supp. at 1313–1315, and in United States v. West Peachtree Tenth Corporation, 437 F.2d 221 (5 Cir. 1971). Those discussions need not be repeated here. The number of incidents necessary to show a pattern or practice depends upon the nature of the right protected and the nature of the ordinary violations of that right. The pattern or practice requirement means that the proven discriminatory conduct was not merely an isolated instance of racial discrimination, but that it was an event which happened in the regular procedures followed by the defendant and/or his employees.

█ In this case defendant published only two advertisements. The first was published before the statute was called to his attention. His first reaction was to question the interpretation of the Department of Justice, but when the Department reiterated its position, defendant told his employees to bring any such ads to his attention. The second ad was published without defendant's approval, not intentionally or deliberately by him, but as a result of the failure of an employee to bring the ad to his attention. Defendant is not a racist and does not advocate or wish to countenance racial discrimination. He indicated on the stand that he disagrees with the Department's interpretation of the law, but that he would consider the wording of each ad presented to him. The Government has not proved such a pattern or practice as would justify an injunction in this case.

█ The alternative justification for relief is for the Government to show "that any group of persons has been denied any of the rights granted by this subchapter and such denial raises an issue of general public importance". No black person is shown to have complained of either of the two ads which form the basis of this case. The ads in the Washington daily papers show that similar ads are customarily published both by white and "colored" homeowners.[4] The Government did not prove that anyone has been actually offended or caused any inconvenience by the two ads involved in this case.

The Court has found that the ads violated § 3604(c) and that the application of that subsection to such advertisements does not deprive defendant of any of his constitutional rights. But every violation of § 3604(c) does not raise an issue of such general public importance as to justify an injunction, where no pattern or practice has been shown, and where the court is satisfied that the defendant will obey the law as declared.

█ There is a clearer reason, however, for denying the requested injunction in this case. It has been shown that the large Washington daily newspapers have been carrying similar advertisements both before and after the filing of this suit against the publisher of a county newspaper with a small circulation. The Government has an obligation to treat citizens fairly and equally and to do equity when it seeks equitable relief.

Counsel should agree upon an appropriate judgment giving effect to the rulings in this opinion.

4. The alternative methods of enforcement should be considered. Section 3610 provides that a person who claims to have been injured by a discriminatory housing practice, or who believes that he will be irrevocably injured by a discriminatory housing practice that is about to occur, may file a complaint with the Secretary of Housing and Urban Development, who shall attempt to correct the alleged discriminatory housing practice by informal methods of conference, conciliation and persuasion. If the Secretary is unable to obtain voluntary compliance within a specified period, the party aggrieved may within 30 days thereafter "commence a civil action in any appropriate United States district court, against the respondent named in the complaint, to enforce the rights granted or protected by this subchapter," subject to certain provisos. Section 3612 provides for the enforcement of the rights granted by §§ 3603–3606 by private civil actions. The remedies provided by § 3610 and § 3612 will be effective in certain types of cases.